STATE of Tennessee

v.

Gary Dwayne HARTON, Michael
Terrell Thomas, and Shawn
Lavell Fore.

Court of Criminal Appeals of Tennessee,
at Nashville.

April 10, 2002 Session.

May 22, 2002.

Application for Permission to Appeal
Denied by Supreme Court
Nov. 4, 2002.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William Michael McCown, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellant, State of Tennessee.

John H. Norton, III, Shelbyville, TN, and Cynthia C. Chappell, Nashville, TN, for the appellees, Gary Dwayne Harton, Michael Terrell Thomas and Shawn Lavell Fore.

JOE G. RILEY, J., delivered the opinion of the court, in which NORMA McGEE OGLE and ALAN E. GLENN, JJ., joined.

## OPINION

This is a consolidated state appeal from the trial court's order suppressing evidence in two separate drug cases involving three defendants. The defendants were stopped on Interstate 65 in Marshall County when officers observed traffic violations; their vehicles were searched after a trained canine "alerted;" and, as a result of the search of their vehicles, they were charged with possession of a substantial quantity of drugs with intent to sell. The state contends the trial court erred (1) in declaring Tenn.Code Ann. § 55–8–124, the "following too closely" statute, unconstitutionally vague; and (2) by finding an equal protection violation based upon selective prosecution due to the officers' use of various "indicators" in determining whether to stop the vehicles for traffic violations. We conclude Tenn.Code Ann. § 55–8–124 is not unconstitutionally vague, and the stops did not deprive the defendants of equal protection; therefore, we reverse the judgments of the trial court.

Although we subsequently conclude that many of the following facts have no relevance to the actual stops in the cases before us, we recite the following facts to give a proper overview of the issues presented.

Agents Jeff Duncan and Shane Daugherty worked with the Seventeenth Judicial District Drug and Violent Crime Task Force, whose primary goal was drug interdiction. These agents had received specialized training in drug interdiction, including the use of various "indicators" to determine which persons would be the most likely to possess drugs while operating a motor vehicle. The agents also utilized canines specially trained to detect drugs.

The officers often worked Interstate 65 in Marshall County. If an agent observed one or more indicators, the agent would likely closely observe and/or follow the vehicle. If no traffic violation were observed, the vehicle would not be stopped. If a traffic violation were observed, the

agent would often stop the vehicle. In the absence of appropriate indicators, the agent was unlikely to stop a vehicle for minor traffic violations that did not pose a danger to the public. If the vehicle were stopped, the officer might use a canine for a sweep of the vehicle, again depending upon the presence of indicators and/or the surrounding facts and circumstances.

There were a number of indicators utilized by the officers in determining whether to effectuate a stop after observing a traffic violation and/or whether to sweep the vehicle with a canine. Some of the indicators were as follows:

(1) whether the driver looks in another direction or stares when observing the officer's vehicle;

(2) whether the vehicle exhibits a license plate from certain known drug origin states, such as Texas, Arizona or Florida;

(3) whether the vehicle is "low riding;"

(4) whether the driver exhibits erratic driving behavior, makes quick lane changes, or attempts to exit the interstate;

(5) whether the driver or passenger makes furtive movements, such as reaching under the seat;

(6) whether the driver is tense, nervous, overly polite, or totally agreeable to anything the officer says; and

(7) whether the driver and passenger give conflicting stories as to their relationship or place of origin.

As found by the trial court, stops were not made based upon race of the vehicle occupants.[1] Generally, the officers looked for anything they would consider abnormal in determining whether to effectuate the stop after observing a traffic violation. There was no set formula for determining when to initiate a stop based upon the presence of a certain number or type of the indicators, nor did the task force have a written policy.

## HARTON STOP

On February 3, 2000, Agent Daugherty was observing traffic from his patrol car in the median on Interstate 65. As defendant Harton's vehicle passed him, Agent Daugherty noticed a small child standing up in the backseat and further was unable to see a license tag on the vehicle. He pulled out immediately, pursued the vehicle, and initiated a stop based upon the child restraint violation and the apparent lack of a tag. Upon stopping the vehicle, Agent Daugherty noticed an Illinois temporary tag in the back window.

Defendant Harton and his child were the only occupants of the vehicle. Agent Daugherty ascertained from the defendant that the child was two and one-half years of age. The defendant was unable to produce a driver's license. The defendant produced some paperwork concerning the vehicle; it showed that it had been purchased the day before in Chicago by a female.

While Agent Daugherty was running a computer check, Agent Duncan arrived. Agent Daugherty asked Agent Duncan to walk the canine around the vehicle. The dog alerted, leading to the subsequent search and seizure of over 242 grams of cocaine. In addition, the defendant turned over a small bag of marijuana which he had in his sock.

## THOMAS/FORE STOP

On May 3, 2000, Agent Duncan was in his patrol car at a crossover on Interstate

---

1. Although the trial court noted its suspicions about whether race was a factor, the trial court expressly concluded "the record does not support a finding that the stops were race[-]related."

65 when he observed the Thomas/Fore light-colored Chevrolet Caprice. At first the vehicle appeared to the agent to be a patrol car, but it did not have government tags. It had heavily tinted windows, quickly slowed down, was driving at a different speed than the other traffic, and had a temporary tag in the window. Agent Duncan observed two people in the vehicle but was unable to determine their gender or race. He followed the vehicle for several miles; noted its slow speed which, in the officer's experience, often indicates the driver is drinking or tired; observed a truck with a trailer pass the subject vehicle; and noticed the subject vehicle speed up and follow only one and one-half to two car lengths directly behind the truck and trailer for a distance of approximately two miles. Believing the subject vehicle was "following too closely," the agent effected a stop.[2]

Fore, the driver, was unable to produce the vehicle's registration, and the photograph on his driver's license did not match his appearance. The driver's license was in the name of "Tonga M. Price." Agent Daugherty arrived, talked briefly to passenger Thomas, and began running a computer check on Fore and Thomas. The defendants had given somewhat conflicting stories to the agents as to their origin and destination. While Agent Daugherty was running the computer check, Agent Duncan walked his canine around the subject vehicle. The canine alerted, leading to the search and seizure of over 505 grams of cocaine. In addition, several small bags of marijuana were subsequently found hidden in the backseat of the patrol car which had been occupied by the defendants during the canine sweep.

## TRIAL COURT PROCEEDINGS

The defendants in both cases filed motions to suppress the seizure, alleging improper stops of the vehicles. As to the Thomas/Fore stop, the trial court concluded that Tenn.Code Ann. § 55–8–124, "the following too closely" statute, was unconstitutionally vague and overbroad, and impermissibly allowed the authorities too much discretion by not establishing sufficient guidelines. As to both stops, the trial court specifically found that "the record does not support a finding that these stops were race[-]related." Nevertheless, the trial court found that drivers of vehicles meeting certain "indicator criteria" were treated differently than other motorists. The trial court found that the procedures employed by the task force impaired the fundamental right to travel. More specifically, the trial court held the procedures employed by the task force were examples of selective enforcement in violation of the constitutional right to equal protection. The trial court ordered all evidence in both cases suppressed.

## CONSTITUTIONALITY OF TENN. CODE ANN. § 55–8–124

■ The pertinent portion of the Tennessee statute prohibiting "following too closely" is as follows:

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

Tenn.Code Ann. § 55–8–124(a). The trial court concluded this statute was unconstitutionally vague and overbroad and en-

---

**2.** The agent also stated he stopped the vehicle for violation of the tint law. The state does not rely upon this as a basis for the stop since the tint law does not apply to a vehicle that is not registered in this state. Tenn.Code Ann. § 55–9–107(a)(1). The agent was unaware that the vehicle must be registered in Tennessee at the time he made the stop.

trusted law enforcement authorities with too much discretion.

■ Our constitution requires that a statute provide "fair warning" to those of ordinary intelligence as to prohibitive conduct. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The fair warning requirement, however, does not require absolute precision. *State v. Wilkins,* 655 S.W.2d 914, 916 (Tenn.1983). In addition, our constitution provides a criminal law is facially vague if it authorizes and encourages arbitrary and discriminatory enforcement. *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). A statute providing no legally fixed standards, leaving to the personal predilections of an officer the determination of the illegality of conduct, is unconstitutionally vague on its face. *State v. Burkhart,* 58 S.W.3d 694, 699 (Tenn.2001). Furthermore, a statute may be challenged as overbroad if it affects a substantial amount of conduct that is constitutionally protected. *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

■ A statute's use of words of "general meaning, because greater precision is both impractical and difficult," does not render the statute unconstitutionally vague. *State v. Lyons,* 802 S.W.2d 590, 592 (Tenn.1990); *see also Arnett v. Kennedy,* 416 U.S. 134, 159–60, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Furthermore, this court must initially presume the statute is constitutional and uphold its constitutionality whenever possible. *State v. Robinson,* 29 S.W.3d 476, 479–80 (Tenn.2000).

Our criminal statutes are replete with the use of the "reasonable" standard in making numerous determinations. *See, e.g.,* Tenn.Code Ann. §§ 39–11–106(a)(36)(A)(ii) ("reasonable time" after offense to determine fair market value);– 11–201(a) (requirement of proof beyond a "reasonable doubt");–11–402(3) (failing to make "reasonable effort" to prevent offense);–11–411(a) ("reasonable ground" to believe offender has committed felony);–11–611(a) ("reasonably believes" force is necessary for self-defense); *Id.* (self-defense founded upon "reasonable grounds");–13–101(a)(2) (causing another to "reasonably fear" imminent bodily injury);–13–211(a) ("reasonable person" standard for voluntary manslaughter); 40–7–103(3) (arrest based upon "reasonable cause" for believing felony has been committed).

■ A statute is not unconstitutionally vague merely because it is based upon a "reasonableness" standard. *United States v. Ragen,* 314 U.S. 513, 523, 62 S.Ct. 374, 86 L.Ed. 383 (1942) (holding "reasonable allowance" for compensation not to be unconstitutionally vague). This court has also upheld statutes based upon the reasonableness standard. *See State v. Nathan McKissack,* C.C.A. No. 01C01–9804–CC–0190, 1999 WL 77846, at *8, 1999 Tenn.Crim.App. LEXIS 149, at *12–13 (Tenn.Crim.App. Feb. 19, 1999, at Nashville), *perm. to app. denied* (Tenn. Oct. 4, 1999) (holding Tenn.Code Ann. § 39–16–609(b)(2), which creates defense to failure to appear based upon a "reasonable excuse," not to be unconstitutionally vague); *State v. Aaron Cooper,* C.C.A. No. 01C01–9708–CR–00368, 1998 WL 668263, at *4, 1998 Tenn.Crim.App. LEXIS 1015, at *6 (Tenn.Crim.App. Sept. 29, 1998, at Nashville) (finding Tenn.Code Ann. § 39–13–402(a)(1), including phrase "any article used or fashioned to lead the victim to *reasonably* believe it to be a deadly weapon," not to be unconstitutionally vague (emphasis added)).

In addition, other states have upheld "following too closely" statutes with identical wording as that contained in the Ten-

nessee statute. *See State v. Shapiro,* 751 So.2d 337, 342 (La.App. 4th Cir.1999); *Logan City v. Carlsen,* 585 P.2d 449, 450 (Ut.1978); *People v. Heid,* 270 N.Y.S.2d 474, 476, 50 Misc.2d 409 (N.Y.1966). We believe our sister states correctly decided this issue and see no reason to hold differently.

We conclude Tenn.Code Ann. § 55–8–124, our "following too closely" statute, provides fair warning of prohibitive conduct and provides sufficient guidance to prevent arbitrary and discriminatory enforcement. We conclude the statute is neither unconstitutionally vague nor overbroad.

### DENIAL OF EQUAL PROTECTION

Although the trial court recognized "[t]he procedures of the [Drug Task Force] in stopping and searching vehicles on I–65 comport with the present generally accepted principles of law," the trial court found "the procedures used by the Drug Task Force in determining which vehicles to stop amounts to selective prosecution in violation of the Equal Protection Clauses of both the Tennessee and United States Constitutions." We now determine whether the stops, searches and seizures in these cases were unconstitutional.[3]

### A. Underlying Fourth Amendment Concerns

We, as did the trial court, first recognize the interplay between the Fourth Amendment protection against unreasonable searches and seizures and the Equal Protection Clause. It is now clear the subjective intentions or actual motivations of officers are irrelevant to any

Fourth Amendment claim, *see Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), or claim under Tennessee Constitution Article I, § 7, *see State v. Vineyard,* 958 S.W.2d 730, 736 (Tenn.1997). Thus, a stop based upon probable cause to believe the traffic code has been violated is constitutionally permissible, regardless of the subjective motivation of the police officer making the stop. *Whren,* 517 U.S. at 819, 116 S.Ct. 1769; *Vineyard,* 958 S.W.2d at 734. Defendants argue that if *Whren* and *Vineyard* are "allowed to stand, without limitation, then law enforcement officers, particularly those charged with the duty of drug interdiction, may use a Tennessee statute and the power provided to them under *Whren* as unbridled authority to search a target vehicle for contraband." However, as a state intermediate appellate court, we are not at liberty to overrule the United States Supreme Court, *see Arkansas v. Sullivan,* 532 U.S. 769, 772, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001) (holding the state court is without authority to interpret the United States Constitution more restrictively than the United States Supreme Court), or the Tennessee Supreme Court, *see State v. Middlebrooks,* 995 S.W.2d 550, 569 (Tenn. 1999) (Appendix).

Nevertheless, both *Whren* and *Vineyard* recognized the Equal Protection Clause prohibits selective enforcement of the law based upon impermissible criteria, such as race. *Whren,* 517 U.S. at 813, 116 S.Ct. 1769; *Vineyard,* 958 S.W.2d at 734 n. 6. It is the defendants' position that the criteria used by the officers in this case violated equal protection in that the officers relied

---

**3.** It is unclear from the trial court's ruling whether the trial court only declared the stops unconstitutional, or whether the trial court also declared the subsequent searches and seizures unconstitutional. To a limited ex-

tent, the trial court's ruling did address treatment of the defendants after the initial stop. Accordingly, we have elected not only to address the initial stop, but subsequent actions of the authorities leading to the seizure.

upon impermissible criteria in determining whether to effectuate the stops.

 This court also recognizes a canine sweep around a legally detained vehicle does not constitute a search within the meaning of the Fourth Amendment and need not be supported by probable cause or reasonable suspicion. *State v. England,* 19 S.W.3d 762, 764 (Tenn.2000). Furthermore, a positive alert by a trained narcotics detection canine provides probable cause to conduct a search. *Id.* at 768. Although the reliability of the canines utilized in these cases was questioned at the trial court level, the issue was resolved against the defendants. That issue is not before this court; therefore, if defendants' vehicles were properly detained at the time of the canine sweeps and positive alerts, the officers had probable cause to conduct the subsequent search for drugs.

**B. Selective Enforcement/Equal Protection**

 Because practical realities dictate the allocation of limited public resources, our courts must afford public officials substantial discretion with regard to law enforcement decisions. *See Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). The fact that some escape the reach of the law while others have laws enforced against them does not, in and of itself, violate the equal protection guarantees in our federal and state constitutions. *See State v. Martin,* 719 S.W.2d 522, 525 (Tenn.1986). There is no constitutional right to have the law go unenforced against an offender. *Futernick v. Sumpter Township,* 78 F.3d 1051, 1056 (6th Cir.1996).

 Nevertheless, government officials do not have totally unfettered discretion to enforce our criminal laws; enforcement decisions may not be deliberately based upon unjustifiable standards such as race, religion, or other arbitrary classifications. *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Persons claiming selective enforcement must establish that the law enforcement decision had a discriminatory purpose and produced a discriminatory effect. *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). The two elements of a selective enforcement claim are: (1) the government has singled out the claimant for enforcement action while others engaging in similar activity have not been subject to the same action; and (2) the decision to prosecute rests on an impermissible consideration or purpose. *421 Corp. v. Metropolitan Government,* 36 S.W.3d 469, 480 (Tenn.Ct.App.2000). The first element requires proof that other non-prosecuted offenders engaged in similar conduct; those offenders violated the same law the claimant is accused of violating; and the magnitude of their violation was not materially different from that of the claimant. *Id.* As to the second element, the claimant must establish the government singled out a protected class of citizens for enforcement, or the prosecution was intended to deter or punish the exercise of a protected right. *Id.* at 481.

**C. Racial Profiling**

· The defendants, all African–Americans, contend they were the victims of racial profiling. As stated, selective enforcement based upon racial considerations runs afoul of the Equal Protection Clause. *Whren,* 517 U.S. at 813, 116 S.Ct. 1769. However, after hearing all the evidence, the trial court expressly found "the record does not support a finding that these stops were race[-]related." The evidence does not preponderate against this finding; therefore, we are bound by this finding. *See State v. Ross,* 49 S.W.3d 833, 839

(Tenn.2001) (holding findings of fact made by the trial court at suppression hearing are binding upon the appellate court unless evidence preponderates otherwise). Accordingly, defendants have not established an equal protection violation based upon race.

### D. Harton Stop

The undisputed evidence with regard to the Harton stop was that the officer immediately pursued and stopped the defendant upon seeing the unrestrained young child and the absence of a license plate. Although the officer observed a temporary tag after making the stop, that certainly would not invalidate the stop or preclude the officer from continuing with the stop relative to the child restraint violation. We have found no explicit finding by the trial court indicating this stop was based upon any other criteria. However, the trial court did find in both cases that "[t]he decision as to who[m] to stop is predicated upon a classification based on a largely undefined set of criteria and often left to the unbridled discretion of an individual officer;" the trial court found the procedures violated the Equal Protection Clause. To the extent that the trial court implicitly found the Harton stop was based upon criteria other than the child restraint violation and possible license tag violation, the evidence preponderates against such a finding. There is nothing in the record to indicate any possible equal protection violation regarding the initial stop of the Harton vehicle.

As to the procedures employed after the stop, the evidence is undisputed the defendant did not possess a driver's license nor any other identification; the vehicle documentation reflected a female purchased the car the day before in Chicago; no female was in the vehicle; the defendant stated he had flown to Chicago to pick up the vehicle, yet he had no personal identification; there was a canine sweep while the officer was checking the computer records with regard to the defendant; and the canine alerted during this sweep. We see nothing in the record to indicate any other criteria, and certainly not any impermissible criteria, were used by the officers with regard to the search and seizure. We see nothing to suggest an equal protection violation; the Harton stop, search, and seizure were valid.

### E. Thomas/Fore Stop

The undisputed evidence with regard to the Thomas/Fore stop was that the officer observed the vehicle had heavily tinted windows, quickly slowed down and had a temporary tag. Although the officer saw two occupants, he was unable to ascertain their gender or race. He followed the vehicle and was concerned that its slow speed might indicate the driver was drinking or tired. The vehicle then sped up after being passed by a truck with a trailer. As noted at the suppression hearing by the trial court, it was further "unrefuted" that, "as [the officer] testified, the vehicle was one and a half to two car lengths behind [the truck and trailer], going 70 miles an hour." The officer then initiated the stop for "following too closely" and the tint law violation.

Again, we have found no explicit finding by the trial court indicating this stop was based upon any other criteria. The fact that the officer improperly relied upon the tint law does not invalidate the stop for "following too closely." Although the officer did not necessarily stop all vehicles he observed following too closely, his decision to stop defendants' vehicle was not based upon impermissible considerations. *See 421 Corp.*, 36 S.W.3d at 480. Considering all the facts and circumstances surrounding the decision to stop the vehicle, we are

unable to conclude that non-prosecuted violations were of the same magnitude as the instant violation. *See id.* Defendants have further failed to establish that the stop had a discriminatory purpose or discriminatory effect. For these reasons, the stop did not violate the Equal Protection Clause.

As to the procedures employed after the stop, it is undisputed the defendants were unable to produce the vehicle's registration papers, and Fore's driver's license photo did not match Fore's appearance. The defendants' statements to the officers conflicted as to their origin and destination. Computer checks were begun, and a canine sweep began a little over ten minutes after the stop. The canine alerted; drugs were found thereafter. Again, we see nothing in the record to indicate any other criteria, and certainly not any impermissible criteria, were used by the officers with regard to the search and seizure. There is no evidence of an equal protection violation; the Thomas/Fore stop, search, and seizure were valid.

## CONCLUSION

Although decided under the Fourth Amendment and not under the Equal Protection Clause, the recent United States Supreme Court case of *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), is instructive. The court noted that officers may draw on their experience and specialized training to make inferences that might elude an untrained person. *Id.* at 273, 122 S.Ct. 744. Activities such as slowing down after spotting a law enforcement vehicle, failing to acknowledge the officer's presence, stiffening of posture, and even waving by children, while not unusual in certain instances, might well be significant to a trained officer in determining whether to make an investigatory stop. *Id.* at 275-76, 122 S.Ct.

744. Thus, a determination that "reasonable suspicion exists" for an investigatory stop need not rule out the possibility of innocent conduct. *Id.* at 277, 122 S.Ct. 744 (citing *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

Most of the defendants' allegations concerning law enforcement's use of a variety of "indicators" are simply not applicable under the facts and circumstances of these two cases. The record establishes the stops made in these two cases did not involve questionable criteria. Traffic violations relating to public safety were clearly observed; stops were made based upon these violations; defendants were detained for a reasonable period of time pending computer checks; canine sweeps were properly conducted; and canine alerts gave probable cause for the searches and seizures.

We reverse the judgments of the trial court and remand these cases for further proceedings.