IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 6, 2011 Session

## STATE OF TENNESSEE v. MARK DEMCOVITZ

**Appeal from the Criminal Court of Shelby County**
**No. 06-06817      Paula Skahan, Judge**

_____

**No. W2010-02459-CCA-R3-CD  - Filed April 20, 2012**

_____

Mark Demcovitz ("the Defendant") pled guilty to unlawful possession of marijuana with intent to sell and received an eight year sentence. The trial court entered a judgment reserving two certified questions of law. On appeal, the Defendant asks that this Court answer the following certified questions:

1.  Whether the stop of the defendant for "following too close" violated the defendant's state and federal constitutional rights when the statute is absent any objective criteria for the officer to base his determination on, thereby granting the officer unbridled discretion in determining when a violation occurs?

2.  Whether the stop of a defendant for a minor "cite and release" traffic violation which provided for a fine only, the detention of the defendant exceeded the reasonable length and scope to effectuate the purposes of the stop, placement of the defendant in the secured area of the officer's patrol car, the use of a drug dog "run" around the defendant's vehicle, and the subsequent search of defendant's vehicle violated the rights of the defendant under the federal and state constitutions and, therefore, all evidence resulting from the seizure and search should be suppressed?

After a thorough review of the record, we answer each question in the negative and hold that the Defendant's constitutional rights were not violated. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of**
**the Criminal Court Affirmed**

JEFFREY S. BIVINS, delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Joseph A. McClusky and Massey McClusky, Memphis, Tennessee, for the appellant, Mark Demcovitz.

Robert E. Cooper, Jr., Attorney General & Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Chris Scruggs, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Factual and Procedural Background

The Defendant and his co-defendant, Brian Lindsay, were indicted on one count of unlawful possession of a controlled substance with intent to sell and one count of unlawful possession of a controlled substance with intent to deliver. Prior to trial, the Defendant filed a motion to suppress all evidence discovered as a result of the events leading to his arrest.

Memphis Police Officer Kevin Perry testified at the suppression hearing that, in May of 2006, he was assigned to the West Tennessee Violent Crime and Drug Task Force, to which he had been assigned for approximately four years. On May 16, 2006, he stopped the Defendant and Lindsay for the violation of following too closely.[1] According to Officer Perry, the Defendant was driving a full-sized Chevrolet pickup truck pulling a 25-foot flatbed trailer, and Lindsay was riding in the passenger seat. Officer Perry stated,

> We were eastbound on I-40. I was in the far left-hand lane. Their vehicle was in the far right-hand lane. . . . At that time [the Defendant] was driving the vehicle, had switched from the right-hand lane to the next lane over. When he

---

[1] The text of the statute in effect at the time of the May 16, 2006 offense provided:

(a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonably prudent, having due regard for the speed of the vehicles and the traffic upon and condition of the highway.

. . .

(e) A violation of this section is a Class C misdemeanor.

Tenn. Code Ann. § 55-8-124 (2004).

did, he got in behind a white four-door [s]edan at less than about a car length and was following it from there to almost Highway 64 close to a mile and at that time he switched back from that lane back to the right-hand lane again.

Officer Perry explained that, from his vantage point, he could discern that the truck followed too closely because "the white four-door [s]edan . . . basically disappeared in front of their truck [be]cause they were so close to it you couldn't even see [the sedan] any more." According to Officer Perry, "following too closely" means that "[y]ou're following at a distance less than reasonable and you would not be able to stop in time say if the vehicle in front of you suddenly stopped." He also explained that his estimation of following too closely is based on the Tennessee Rules of the Road[2] handbook which instructs drivers to stay at least two seconds behind the preceding car. Officer Perry approximated that, at the time that he witnessed the violation, his patrol vehicle was about eight car lengths or seventy to eighty feet behind the Defendant's vehicle. However, traffic was light, and there were no vehicles between the officer and the Defendant. Officer Perry stated that he waited about two miles to stop the vehicle because, based on traffic, the initial location was a dangerous place to stop. Once Officer Perry stopped the vehicle, he approached the passenger side and asked the Defendant for his driver's license and proof of insurance. The Defendant produced a Texas driver's license and automobile insurance card, both of which appeared to be valid. Then, Officer Perry asked the Defendant to exit the vehicle and walk to the rear of the truck, and he informed the Defendant about his reason for the stop.

Officer Perry stated that he asked the Defendant about Lindsay, and the Defendant told him that Lindsay also lived in Texas. At first the Defendant told Officer Perry that Lindsay was helping him drive, but when asked about the validity of Lindsay's driver's license, the Defendant then stated that he, in fact, was the only individual who had been driving. When Officer Perry asked the Defendant to where they were driving, the Defendant initially said Nashville and then "stopped and caught himself" and said that they were driving to Knoxville. According to Officer Perry, the Defendant's stated reason for the trip to Knoxville was to pick up a "s**tkicker," which is slang for a manure spreader. The Defendant informed Officer Perry that the manure spreader had already been purchased and paid for, and they were simply on their way to pick up the machine and possibly another piece of machinery.

---

[2] "Rules of the Road" is a subsection of the Tennessee Comprehensive Driver's Manual posted on the Tennessee Department of Safety and Homeland Security website. See Tennessee Comprehensive Driver License Manual, Tennessee Department of Safety and Homeland Security (July 1, 2009), http://www.tn.gov/safety/dlhandbook/DL_Manual2011.pdf.

Officer Perry testified that he then returned to Lindsay and asked him essentially the same questions. Lindsay stated that they were going to pick up a crop spreader, rather than a manure spreader. Defendant's counsel asked whether Officer Perry was certain that Lindsay said "crop spreader" and not "crap spreader." Officer Perry responded that he felt fairly certain, particularly because Lindsay said it several times. Lindsay also stated that his boss had not yet purchased the machine but instead was waiting for them to see the machine in person. Like the Defendant, Lindsay began to tell Officer Perry that they were headed to Nashville, but he stopped himself and said that Knoxville was their destination. Lindsay's driver's license was an expired New Jersey license, and Lindsay told Officer Perry that, although he was currently still residing in New Jersey, he was in the process of moving to Texas.

Officer Perry testified that, after speaking with Lindsay, he went back to inform the Defendant that he would go ahead and check the validity of their licenses with Blue Lightening Operations Center ("BLOC"). He then noticed a knife holder on the Defendant's hip, and he asked the Defendant if the Defendant was carrying any weapons – "any knives, guns, or anything like that" – to which the Defendant answered no. Officer Perry asked the Defendant for permission for a pat-down search to be sure there were no weapons in the Defendant's possession, and the Defendant agreed. Upon execution of the pat-down, Officer Perry felt a hard object in the Defendant's front pocket, so Officer Perry inquired and discovered that it was a Beretta .22 caliber handgun. Officer Perry acknowledged that this interaction with the Defendant made him suspicious because the Defendant "was wearing a knife holder but stated that he didn't have any weapons on him." The Defendant also showed Officer Perry his valid Texas handgun carry permit. Officer Perry then asked the Defendant if he would sit in the back of the squad vehicle until Officer Perry was able to run the checks on the licenses. The Defendant agreed and sat in the back of the vehicle with the door closed.

Officer Perry acknowledged that because the door to the back seat does not open from the inside, the Defendant was secure in the vehicle and, thus, not free to leave. According to Officer Perry, at the time that he placed the Defendant in the back of the patrol car, there were already multiple discrepancies raising suspicion in the officer's mind. He also acknowledged that he is familiar with State v. Berrios, and because of that decision, his practice now is to ask stopped individuals for consent to place them in the back of the patrol car. Unless the individual consents, Officer Perry stated that he would not place that person in the patrol car absent probable cause.

The State asked Officer Perry why he used BLOC to run the checks, and Officer Perry stated that it is protocol to use BLOC in order to obtain information concerning the validity of driver's licenses, registration, and warrants. Additionally, BLOC can provide information

-4-

regarding border crossings, which other similar agencies cannot. Officer Perry also stated that, in a traffic stop with multiple occupants, it is customary to check each occupant's driver's license.

Once the Defendant was secured in the patrol car, Officer Perry asked for permission to search the Defendant's truck, to which the Defendant agreed. Officer Perry then retrieved his canine partner, Zena, a trained and certified narcotic detecting dog, to conduct a sweep of the truck. Officer Perry explained that, based on the inconsistent stories from the Defendant and Lindsay, he believed that there was some sort of criminal activity underway and that Zena would assist him in learning whether that criminal activity involved narcotics.

Officer Perry stated that Zena is a Belgian Melawa, which is a breed recognized for its acute sense of smell. Zena is trained and certified through the National Narcotic Detector Dog Association. Additionally, Officer Perry stated that he had been certified in handling narcotic detecting canines, and he and Zena had undergone training together. Officer Perry had Zena from July 2005 through June 2007, at which time Zena went to work with a different officer.

Officer Perry testified that when he and Zena reached the front of the trailer that was attached to the truck, Zena sat and alerted the officer to the presence of narcotics. He stated that Zena also tried to sit and alert him along the backside of the trailer, but she was unable to do so because Officer Perry was standing so close to her. He noted that, during this process, about ten minutes had passed from the time of the initial stop, and he had not heard back from BLOC. On cross-examination, Officer Perry acknowledged that it had been fourteen minutes since the initiation of the stop when he began the canine sweep. After placing Zena back in the patrol vehicle, Officer Perry bent down to look under the front of the trailer where Zena indicated the presence of narcotics, and he said, "I picked up a very strong odor of raw marijuana coming from the bottom of it. And when I looked, I could see wooden slates and I looked up in between the slates you could see like cellophane packaging up inside there." Further, he noticed that there were slates placed across the bottom of the frame to secure packages and a board that was brown when looking from the ground up underneath the trailer but appeared "black, almost like you were looking as [sic] asphalt" from the top of the trailer. Upon finding this, Officer Perry went to Lindsay who was still sitting in the truck, patted him down, and asked him to have a seat with the Defendant in the back of the patrol car. In the pat-down of Lindsay, Officer Perry found a large amount of cash that turned out to be $800 or $900. Additionally, Officer Perry stated that he found over $6,000 inside the truck.

After securing Lindsay in the back of the patrol vehicle, Officer Perry retrieved the packages of marijuana from the Defendant's truck. He cut open the packaging– multiple

layers of plastic wrap and aluminum foil– to visually observe the contents of one of the packages. Officer Perry stated that samples from the packages were sent for testing to the Tennessee Bureau of Investigation ("TBI") and that, in total, the packages contained approximately 591 pounds of marijuana. Around three or four minutes after placing Lindsay in the patrol vehicle, Officer Perry received the call from BLOC regarding the checks requested on the Defendant and Lindsay.

On cross-examination, Officer Perry acknowledged that, when he stops vehicles for traffic violations, he looks for criminal indicators beyond the mere reason for the stop. Further, he acknowledged that he is trained to ask questions unrelated to the purpose underlying the stop. He also verified that he has been to extensive training in how to look for such criminal indicators and that the procedure that he followed in this case stems from this training.

The trial court denied the motion to suppress as to the evidence seized but granted the motion to suppress as to the statements made by the Defendant and Lindsay post-arrest. Specifically, the trial court held that Officer Perry had probable cause[3] to stop the Defendant based on the officer's observations that the Defendant was following too closely in violation of Tennessee Code Annotated section 55-8-124.

The trial court also determined that the Defendant consented to the frisk, to his placement into the patrol car, and to the search of his vehicle. Additionally, the trial court stated that the Defendant's "unintentional concealment of the handgun provided the necessary reasonable suspicion to place [the Defendant] securely in the rear compartment of the patrol vehicle." The trial court also held that there was probable cause to search the Defendant's trailer, based on sufficient facts to establish reliability of the canine sweep.

Finally, the trial court held that the statements made by the Defendant and Lindsay to Officer Perry from the back of the patrol car fell under a custodial interrogation. Because no Miranda warnings were provided and Officer Perry asked the co-defendants questions before reaching the police station, all statements made during this time were in violation of the co-defendants' Miranda rights. Accordingly, the trial court suppressed all such statements.

---

[3] Although the trial court determined that Officer Perry had probable cause to stop the vehicle, Officer Perry would have been permitted to stop the vehicle with merely reasonable suspicion "that the occupants of the vehicle have committed, are committing, or are about to commit a criminal offense." State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

The trial court also granted a motion to sever the Defendant and Lindsay as co-defendants. On November 16, 2010, the Defendant pled guilty to possession of marijuana, but he reserved two certified questions of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2)(a). The trial court sentenced the Defendant to eight years. The Defendant timely appealed the judgment of the trial court, asking this Court to review the following certified questions:

1.   Whether the stop of the defendant for "following too close" violated the defendant's state and federal constitutional rights when the statute is absent any objective criteria for the officer to base his determination on, thereby granting the officer unbridled discretion in determining when a violation occurs?

2.   Whether the stop of a defendant for a minor "cite and release" traffic violation which provided for a fine only, the detention of the defendant exceeded the reasonable length and scope to effectuate the purposes of the stop, placement of the defendant in the secured area of the officer's patrol car, the use of a drug dog "run" around the defendant's vehicle, and the subsequent search of defendant's vehicle violated the rights of the defendant under the federal and state constitutions and, therefore, all evidence resulting from the seizure and search should be suppressed?

**ANALYSIS**
I. Constitutionality of Tennessee Code Annotated Section 55-8-124

The Defendant asks this Court to determine whether Tennessee Code Annotated section 55-8-124 is unconstitutionally vague or overbroad. The text of Tennessee Code Annotated section 55-8-124 provides, "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

Under the United States Constitution, a criminal statute is considered vague on its face "if it authorizes and encourages arbitrary and discriminatory enforcement." State v. Harton, 108 S.W.3d 253, 259 (Tenn. Crim. App. 2002) (citing City of Chicago v. Morales, 527 U.S. 41, 56 (1999)). Our Supreme Court has determined that a statute is facially vague only when it provides "no legally fixed standards, leaving to the personal predilections of an officer the determination of the illegality of conduct." Id. (citing State v. Burkhart, 58 S.W.3d 694, 699 (Tenn. 2001)). To challenge a statute as overbroad, the language of the statute must affect "a substantial amount of conduct that is constitutionally protected." Id. (citing Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494 (1982)).

The U.S. Constitution requires that laws provide a reasonable opportunity to those of ordinary intelligence to understand what conduct is prohibited. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972); Harton, 108 S.W.3d at 259. However, a "fair warning" is not a requirement for absolute precision. State v. Wilkins, 655 S.W.2d 914, 916 (Tenn. 1983) *superceded, on other grounds, by statute* 1989 Tenn. Pub. Acts Ch. 591 (S.B. 1194), *as recognized in* State v. Dominy, 6 S.W.3d 472 (Tenn. 1999). A statute may include language of "general meaning" if the use of precise wording and guidelines proves complicated and impractical. Harton, 108 S.W.3d at 259 (quoting State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990)) (other citation omitted). Furthermore, this Court must presume that a statute is constitutional and uphold the statute when possible. State v. Robinson, 29 S.W.3d 476, 479-80 (Tenn. 2000).

This Court previously has ruled on the constitutionality of this very statute. Harton, 108 S.W.3d at 260. Harton held that the "following too closely" statute "provides fair warning of prohibitive conduct and provides sufficient guidance to prevent arbitrary and discriminatory enforcement." Id. This Court must follow binding precedent found in prior published decisions of this Court. See Tenn. Sup. Ct. R. 4(G)(2) ("Opinions reported in the official reporter, however, shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction."); see also State v. Martha Patlan, No. M2011-01175-CCA-RM-CD, 2011 WL 2848395, at *10 (Tenn. Crim. App. July 18, 2011), no perm. app. filed ("Published precedent binds us . . . ."). Additionally, other jurisdictions, including the Tenth Circuit, also have held that this precise statutory language is not unconstitutionally vague. See United States v. Hunter, 663 F.3d 1136, 1142 (10th Cir. 2011); State v. Shapiro, 751 So.2d 337, 342 (La. App. 4th Cir. 1999); Logan City v. Carlsen, 585 P.2d 449, 450 (Ut. 1978). Therefore, we afford the Defendant no relief on this issue.

## II. Search and Seizure

The Defendant argues that the evidence obtained as a result of the stop, detention, placement in the patrol car, canine sniff, and subsequent search was in violation of his rights under the Tennessee and United States constitutions. Thus, the Defendant asserts that the trial court should have suppressed all evidence resulting from activities transpiring from the stop.

When conducting a review of the trial court's determinations from a suppression hearing, questions regarding the witnesses' credibility, "the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, we will uphold the trial court's factual findings unless the preponderance of the evidence is otherwise. Id. However,

where the trial court has applied the law to the facts, we will conduct a de novo review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Because the State is the prevailing party, it is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.

Both the Fourth Amendment to the United States Constitution, as well as article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. State v. Ingram, 331 S.W.3d 746, 754 (Tenn. 2011) (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)).[4] As the Tennessee Supreme Court has stated, it is a "fundamental principle under our state and federal constitutions that a warrantless search is presumed invalid and any evidence discovered as a result is subject to suppression." Ingram, 331 S.W.3d at 754 (citing State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008); State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Thus, when a search or seizure is determined to be illegal, the evidence obtained in that search or seizure is excluded from use by the prosecution. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). This exclusionary rule "was designed to protect Fourth Amendment guarantees by deterring lawless searches, seizures, and arrests." Huddleston, 924 S.W.2d at 674.

There are several recognized exceptions to the rule against warrantless searches. Ingram, 331 S.W.3d at 755. Because a trial court must presume "that a warrantless search or seizure is unreasonable," it is the State's burden to establish "that one of the exceptions to the warrant requirement applied at the time of the search or seizure." Giddens v. State, No. M2006-01938-CCA-R3-PC, 2008 WL 271967, at *3 (Tenn. Crim. App. Jan. 29, 2008) (citing State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The most common of these exceptions include: (1) a stop and frisk situation; (2) a search incident to a lawful arrest; (3) consent to search; (4) probable cause to search with exigent circumstances; (5) hot pursuit; and (6) plain view. State v. Day, 263 S.W.3d 891, 901 n.9 (Tenn. 2008) (citations omitted). Courts are admonished to keep these recognized exceptions to the warrant rule "'well-delineated,' 'jealously and carefully drawn,' and 'narrowly' defined." Ingram, 331 S.W.3d at 755 (citations omitted).

---

[4]The Fourth Amendment is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Mapp, 367 U.S. at 655; Ingram, 331 S.W.3d at 754. The intent and purpose of article I, section 7 of the Tennessee Constitution is identical with the Fourth Amendment; however, our Supreme Court has noted previously that Tennessee's search and seizure case law has developed independently from, and extends greater protection than, federal law. See State v. Richards, 286 S.W.3d 873, 877-78 (Tenn. 2009).

A. <u>The Stop</u>

The Defendant first asserts that Officer Perry unlawfully stopped and seized his vehicle. Because we have already held above that the "following too closely" statute passes constitutional muster, we now must determine whether the specific facts of this case establish that Officer Perry was constitutionally permitted to stop the Defendant's vehicle.

An officer may decide to stop a vehicle if that officer has "probable cause to believe that a traffic violation has occurred." <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996). Additionally, an officer is permitted to make an investigatory stop of a vehicle as long as that officer has "a reasonable suspicion, supported by specific and articulable facts, that the occupants of the vehicle have committed, are committing, or are about to commit a criminal offense." <u>State v. England</u>, 19 S.W.3d 762, 766 (Tenn. 2000) (citing <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)) (other citations omitted).

The trial court credited Officer Perry's testimony that the Defendant pulled behind another vehicle with less than a car length between the two vehicles. Moreover, the trial court determined that such an observation by Officer Perry sufficiently established probable cause that the Defendant had violated Tennessee Code Annotated section 55-8-124. The Defendant has not produced any facts that would preponderate against the findings of the trial court that Officer Perry had probable cause to stop the Defendant based on his observation that the Defendant had violated Tennessee Code Annotated section 55-8-124 by following too closely. Thus, there was proper justification for the stop.

B. <u>The Placement of the Defendant in Officer Perry's Patrol Vehicle and Consent to Search</u>

Next, the Defendant asserts that Officer Perry unlawfully confined him in the back of the patrol vehicle, violating his constitutional rights. He also contends that, because he was improperly confined in the back of the patrol car, the consent he gave Officer Perry to search his vehicle was invalid.

First, we recognize that our Supreme Court has held that the placement of an individual into a patrol car following a frisk is more analogous to an arrest than a detention customary to a routine traffic stop. <u>See</u> <u>State v. Berrios</u>, 235 S.W.3d 99, 107 (Tenn. 2007). The Court further noted that such a practice has been considered permissible by other jurisdictions if it "is the least intrusive means of avoiding a dangerous condition outside the vehicle." <u>Id.</u> (citing <u>State v. Lozada</u>, 92 Ohio St.3d 74, 748 N.E.2d 520 (2001) (holding that placement of a driver into the patrol vehicle is reasonable if it "prevents officers or the driver from being subjected to a dangerous condition and placing the driver in the patrol car is the

-10-

least intrusive means to avoid the dangerous condition")). In <u>Berrios</u>, our Supreme Court determined that there was no reasonable basis for the officer to place the defendant in the back of the patrol vehicle, and, thus, the defendant's consent to search given from the back of the patrol car was invalid. <u>Id.</u> at 109.

In the present case, Officer Perry testified that, after observing a knife on the Defendant's hip, he asked the Defendant whether he had any weapons on his person, specifically mentioning guns and knives. The Defendant denied having any weapon on his person but consented to a pat-down search, which revealed not only the knife but also a handgun. Thus, as of that time, Officer Perry was by himself with an individual who lied about the possession of weapons. That situation clearly constituted a valid safety concern. Thus, Officer Perry had a reasonable basis for asking the Defendant to sit in the back of his patrol car. <u>See id.</u>; <u>State of Tennessee v. Robert Cooper</u>, No. W2008-01339-CCA-R3-CD, 2010 WL 3792775, at *7 (Tenn. Crim. App. Sept. 29, 2010). Accordingly, because the placement of the Defendant into the patrol car was proper, the Defendant's consent to search was also valid. <u>See</u> <u>Berrios</u>, 235 S.W.3d at 109.

### C. <u>The Canine Sweep and Detention of the Defendant</u>

The Defendant argues that Officer Perry should not have conducted the canine sweep because the use of the canine sweep extended the duration of the stop beyond what is constitutionally permissible. Further, the Defendant asserts that "[b]ecause the stop was impermissibly expanded, any evidence obtained must be suppressed as fruit of the poisonous tree."

Even though the Defendant gave consent to search his vehicle, Officer Perry conducted a canine sweep, which is not considered a search and, thus, does not require reasonable suspicion or probable cause. <u>See</u> <u>State v. England</u>, 19 S.W.3d 762, 767 (Tenn. 2000); <u>see also</u> <u>United States v. Place</u>, 462 U.S. 696, 707 (1983). "[E]vidence will not be considered as 'fruit' unless the illegality is the 'but for' cause of the discovery of the evidence." <u>Segura v. United States</u>, 468 U.S. 796, 815 (1984). Thus, even if the placement in the back of the patrol car was improper, the evidence was discovered as a direct result of the canine sweep and subsequent search, not the placement of the Defendant into the patrol car.

The canine sweep still might be improper if it lengthened the detention of the Defendant beyond what is permissible for such a stop. <u>State v. England</u>, 19 S.W.3d at 767; <u>see also</u> <u>State v. Harris</u>, 280 S.W.3d 832, 841 (Tenn. Crim. App. 2008). In looking at the length of the detention, we first recognize that, "[r]equests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer

checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." Harris, 280 S.W.3d at 840. "Thus, either (1) the canine sweep of the defendant's vehicle must be properly accommodated within the duration and scope of the legal traffic stop" or (2) the officer must have "some reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop." Id. at 842; see also England, 19 S.W.3d at 767 (holding that running a canine sweep while waiting for a response on the driver's license check did not delay the individual beyond that reasonably necessary "to carry out the purpose of the traffic stop"); Robert Cooper, 2010 WL 3792775, at *7.

Reasonable suspicion has become known as a "common sense standard that permits an officer" to detain a suspect within the context of an investigatory stop "when he or she reasonably suspects that a specific person has engaged in, is engaging in, or is about to engage in criminal activity." State v. Day, 263 S.W.3d 891, 908 (Tenn. 2008). It requires "more than an 'inchoate and unparticularized suspicion or hunch.'" Id. at 907 (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). Courts must look to the totality of the circumstances when determining whether reasonable suspicion existed in the particular case. Id. The State carries the burden of providing facts sufficient to establish reasonable suspicion. Id. at 908. "[I]nconsistencies in information given to an officer during a traffic stop may give rise to reasonable suspicion of criminal activity." State v. Garcia, 123 S.W.3d 335, 350 (Tenn. 2003) (quoting United States v. Smith, 263 F.3d 571, 592 (6th Cir. 2001)).

At the point that Officer Perry initiated the canine sweep, he had not yet received a response from BLOC. In England, both the canine sweep and subsequent search were completed before the officer received the report on the defendant's driver's license. 19 S.W.3d at 768. Similarly, Officer Perry testified that he did not receive a response from BLOC until approximately three or four minutes after securing Lindsay in the back of his patrol vehicle. At that point, Zena had already alerted Officer Perry to the presence of narcotics, and Officer Perry had already smelled a strong odor of marijuana upon inspection of the trailer. Thus, the canine sweep did not extend the duration of the stop beyond what was reasonably permissible. See England, 19 S.W.3d at 768.

The Defendant counters that the wait time to receive a report from BLOC was extended because Officer Perry requested that BLOC check the driver's licenses of both the Defendant and Lindsay. However, we need not determine whether the checks were improper. When Officer Perry began the canine sweep, he had already spoken with the Defendant and Lindsay. From this discussion, he noticed several discrepancies in their stories pertaining to where Lindsay resided, whether Lindsay was assisting in the driving, what type of equipment they were going to retrieve, and whether the equipment was already purchased. Additionally, as mentioned previously, Officer Perry also stated that he noticed a knife holder on the Defendant's hip. When he questioned the Defendant, the Defendant

stated that he had no weapons on his person. Upon receiving consent to conduct a pat-down search, Officer Perry found a knife and handgun on the Defendant. Thus, Officer Perry provided specific and articulable facts that objectively established a reasonable suspicion of criminal activity by the time he completed the pat-down search and placed the Defendant in the back of the patrol vehicle. Therefore, to the extent checking two driver's licenses with BLOC would extend the length of the stop because of the time it would take BLOC to provide results from the two checks, there was already reasonable suspicion on a wholly separate basis to justify the length of the detention. See Harris, 280 S.W.3d at 842. Accordingly, the detention and canine sweep were proper under the United States and Tennessee constitutions.

## C. The Search of the Defendant's Trailer

Lastly, the Defendant asserts that there was not sufficient reliability from the canine sweep to establish probable cause to search the Defendant's trailer. In order to establish probable cause from a canine sweep, the canine must be shown to be reliable through a trial court's finding of fact. England, 19 S.W.3d at 768 (citations omitted). Factors that can establish reliability are "the canine's training and the canine's 'track record,' with emphasis on the amount of false negatives and false positives the dog has furnished" and "the officer's training and experience with this particular canine." Id. (citations omitted).

The trial court found that Zena was a trained and certified narcotics detection dog that had worked with Officer Perry for almost a year when the canine sweep in this case occurred. The court further found that Zena's breed has an especially heightened sense of smell. The Defendant asserts that Zena made a false indication and, thus, should not have been considered reliable. We note that Officer Perry testified that Zena tried to alert him about the presence of narcotics at the back of the trailer and that he did not find drugs there. However, the trial court stated that any evidence presented at the hearing as to a false alert was insufficient to show that Zena was unreliable as a detection dog. Because the trial judge is entrusted with weighing the evidence presented, and the trial court determined that the evidence of the false alert was not substantial enough to weigh against Zena's reliability, the mere fact that Zena might have alerted falsely does not preponderate against the trial court's findings. Thus, the evidence establishing Zena's reliability was sufficient to establish probable cause to search the Defendant's trailer.

## CONCLUSION

-13-

For the foregoing reasons, we affirm the judgment of the trial court.


_____
JEFFREY S. BIVINS, JUDGE